# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **LUCIUS WRIGHT, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **BIRMINGHAM SOUTHERN** | ) | **2:05-CV-1801-VEH** |
| **RAILROAD COMPANY,** | ) | |
| a corporation, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This Court has before it the October 2, 2006 motion of Defendant Birmingham Southern Railroad Company ("BSRR") for summary judgment as to Plaintiff Lucius Wright's ("Wright") Federal Employers' Liability Act ("FELA") claim. (Doc. 11). For the reasons set forth below, BSRR's motion for summary judgment is due to be **DENIED**.

## I. PROCEDURAL HISTORY

Wright commenced this action on August 25, 2005, by filing a complaint in this court alleging a FELA claim. Wright claims that he was hurt while adjusting railcar doors for BSRR and his injuries and damages were caused, in whole or in part,

by the negligent failure of the defendant railroad company to provide Wright with a reasonably safe place to work.  The complaint also states that BSRR negligently required Wright to work at a fast pace in a cramped position under the car.  Wright seeks to recover for the following special injuries: (1) past and future lost wages and benefits; (2) permanent impairment of his ability to earn a living; and (3) past and future medical expenses.  Wright also seeks to recover for the following general injuries: (1) past physical pain and mental anguish; (2) future physical pain and mental anguish; and (3) permanent physical disability.

On October 2, 2006, BSRR filed a Motion for Summary Judgment asserting that: (1) there is no evidence of any negligence on the part of BSRR; (2) Wright's injury was due to underlying degenerative changes in his knee rather than a work-related injury; and (3) BSRR is entitled to summary judgment on Wright's claim for lost wages because Wright failed to mitigate his damages and because he was appropriately terminated.

BSRR has submitted evidence[1] in support of its motion for summary judgment

---

[1]BSRR submitted the depositions of Lucius Wright and Lamar Thomas.  BSRR also submitted BSRR's Rules, the declarations of Don Herring, David Haskett, Roger Owens and Tom Snider, as well as the Public Law Board Opinion No. 6948 and the hearing transcript. The 07/28/05 Termination Notice, 06/08/05 Plaintiff Statement, 06/09/05 Dawson Statement and the 06/08/05 Injury Report were also submitted by BSRR. BSRR also included the 05/06/05 Montclair Clinic Records, Unum Provident Records, 05/26/05 Montclair Clinic Record, 05/09/05 Eiland Record, 05/13/05 Montclair Clinic Record, 05/26/05 Snider Memo to File, 05/27/05 Notice of Investigation, 06/08/05 Szabo Record, 05/26/05 Baptist Montclair Record, 05/26/05

and filed a supporting brief on October 2, 2006.  On October 23, 2006, Wright filed

a brief and evidence[2] in opposition to BSRR's motion for summary judgment.  BSRR

filed a reply brief on November 3, 2006.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. Al Transport*, 229 F.3d 1012, 1023

(11th Cir. 2000).  The party asking for summary judgment always bears the initial

responsibility of informing the court of the basis for its motion and identifying those

portions of the pleadings or filings which it believes demonstrate the absence of a

genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.  Once the moving

party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the

_____

Post-Operative Progress Note, 07/25/05 Montclair Clinic Record, RRB Record, 04/18/06 Baptist Montclair Record and Rule Book acknowledgments.

[2]Plaintiff Wright submitted evidentiary materials that consist of the deposition of Lucius Wright, 05/17/05 Letter from Frank Burge to BSRR's claim department, Letter to Don Herring from Wright, 05/26/05 Baptist Montclair Record, Letter to Dr. Thomas from Wright, deposition of Dr. Thomas, 06/08/05 Injury Report, 06/08/05 Statement of Plaintiff and the 06/29/05 Investigation of BSRR (partial copy).  Wright has also submitted the 07/25/05 Doctor's Note by Dr. Thomas, 08/19/05 Doctor's Note from Dr. Thomas, 07/21/05 Physical Therapy Referral, Diagram of railroad hopper car (drawn by Wright during his deposition), and the 10/18/06 Wright affidavit.

pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. *Id*. At 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 222 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not

4

controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment fo the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim. It simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-

moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegation, but must set forth evidence of specific fact. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

### III. RELEVANT FACTS[3]

## A. Wright's Employment History

Plaintiff Wright began working for BSRR in 1989 in the Maintenance of Way Department. (Wright Dep. 12). In 1990, Wright transferred to the Car Shop, where he began working as a carman's apprentice. (Wright Dep. 12-13). Wright was eventually promoted to carman, a position he held until his termination on July 28, 2005. (Wright Dep. 13, 7/28/05 Termination Notice). A carman's basic duty is to inspect and make any necessary repairs to BSRR's railcars. (Wright Dep. 39-40). Wright acknowledges that safety is very important to BSRR, that the Car Shop prides itself on doing jobs safely, and that the number one rule at BSRR is "Safety First." (Wright Dep. 37). Wright also states that the Car Shop regularly conducts safety training, including formal safety meetings every Wednesday and a safety discussion

---

[3]Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to Wright. Facts are undisputed unless otherwise expressly noted.

at the beginning of each shift. (Wright Dep. 37).  Wright's supervisor at the Car Shop
was Don Herring. (Wright Dep. 35).

## B. Wright's Activities Leading Up to Injury

On Tuesday, May 3, 2005, Wright and the rest of the Car Shop employees
started a job that involved making adjustments to car doors. (Wright Dep. 44-46, 49-
50, 54).  The employees were working in pairs, with Wright working alongside Billy
Barnes, a fellow carman who showed Wright how to adjust the car doors. (Wright
Dep. 46-47, 55).  The task being performed involved making adjustments to the doors
of railcars used to transport coal. (Wright Dep. 45-46).  The doors to the railcars,
which are located on the bottom of the cars, open and close as needed to allow the
coal in the railcar to be let out. (Wright Dep. 45-46).   However, the doors
occasionally need adjustment and, in this case were being adjusted so that they would
close tighter and keep finer pieces of coal from falling out of the railcar. (Wright Dep.
45-46).  While working on the doors, Wright and his coworker used a pipe wrench
to rotate the turnbuckle. (Wright Dep. 52).  Wright positioned himself under the
railcar and used his foot, rather than his hands, to push the wrench to turn the
turnbuckle. (Wright Dep. 57-61).  Wright did not consider this maneuver unsafe.
(Wright Dep. 59-61).  Many of the "spindles," also called "turnbuckles," that Wright
had to turn with his foot were rusted and had to be burned before they could turn at

7

all. (Wright Dep. 133-134). The "pit" was being used by other carmen. (Wright Dep. 147-48). When working in the "pit," there was plenty of room for workers to use their hands to push the pipe wrench. (Wright Dep. 189).

On Wednesday, May 4, 2005, Wright was paired with Wayne Trigg, another carman. (Wright Dep. 52). They also worked on car doors of railcars that day, but in a different location. (Wright Dep. 52-53). Again, Wright did not complain to anyone that the job was unsafe, did not ask for additional assistance, and did not otherwise voice any concern about the job. (Wright 147-148, 151). On Thursday, May 5, 2005, Wright continued performing the same job, but was paired with Tommy Dawson. (Wright Dep. 53). According to Wright, Dawson would place the pipe wrenches in the appropriate position, and Wright, while lying on his back, would push the pipe wrench with his foot in order to turn the turnbuckle. (Wright Dep. 57-59). Wright's workplace under the car was a "cramped up" area. (Wright Dep. 168, 196).

On May 5, 2005 around 2:15 p.m., Wright and Dawson were told they could go home for the day. (Wright Dep. 62). Wright first felt pain while walking, after coming out from under the car. (Wright Dep. 68). Wright walked across the railroad tracks towards the lunchroom to get his lunch box. After retrieving his lunchbox, Wright walked from the lunchroom to the bathhouse. Wright felt his left knee buckle on the way to the bathhouse. (Wright Dep. 64-65, 67-68). Wright also felt a "pop" in

his left knee. (Wright Dep. 69).[4]

## C. Wright's Activities Post-Injury

BSRR rules require all employees to report any alleged injury, no matter how slight, as soon as possible and before the end of their shift. (Wright Dep. 66, 70, 139; BSRR Rules).  Wright was aware that BSRR requires employees to report injuries. (Wright Dep. 70, 139).  Wright did not report any injury or pain to a supervisor before he left work on May 5, 2005. (Wright Dep. 66, 70, 139).

Wright states that the next morning, May 6, 2005, he went to the railroad and told his superior about the work he had been doing the previous day and that he "hurt his knee with the pipe wrenches we was messing with up under that car." (Wright Dep. 71-72).  Wright's supervisor then told him that "it may be arthritis." (Wright Dep 71-72).  Wright was not asked to fill out an accident report at this time. (Wright Dep. 72-73).  The same day, Wright went to see his personal physician since his superior did not offer medical attention from the company doctor, Dr. Szabo. (Wright Dep. 73-74, 79-81).[5]

_____

[4]The parties dispute when Wright first had pain or felt a "pop" in his knee. (Wright Dep. 64-69).

[5]BSRR disputes Wright's  facts and alleges on the morning of May 6, 2005 before his 6:30 a.m. shift began, Wright informed his supervisor that his knee was aching. (Herring Decl. ¶ 8).  According to BSRR, Wright's supervisor, Mr. Herring, asked Wright numerous times if he had sustained an injury at work; Wright responded that he had not sustained an injury. (Herring Decl. ¶ 8).  BSRR alleges that Wright stated that he had felt a slight "give" in his knee as he had

The next contact Wright had with BSRR was on May 9, 2005.  Wright called his railroad superior and reported the "torn ligaments" and the medication he had been given.[6]  He also wrote his superior a letter about his visit to Dr. Thomas. (Wright Dep. 81-82, 103-04).  On June 8, 2005, a car was dispatched to pick up Wright and bring him to the Car Shop where Wright completed the injury report, wrote a statement, and was examined by Dr. Szabo. (Herring Decl. ¶ 21).

**D. Wright's Diagnosis and Treatment**

On May 6, 2005, Wright went to see Dr. Lamar Thomas, his personal physician. (Wright Dep. 80-81).  Dr. Thomas is employed at Baptist Montclair. (Wright Dep. 80-81).  Wright told Dr. Thomas that he was having knee problems.

---

walked to the bathhouse the previous day, and that his knee had been sore when he left work. (Herring Decl. ¶ 8).  The defendant also states that Wright told Mr. Herring that he had experienced similar problems with his knee in the past, that it might have been arthritis that was causing the pain, and that the pain was something that occurred when he would stoop down, bend over, or crawl. (Herring Decl. ¶ 10).  BSRR alleges that Wright stated that he did not want to complete an injury report. (Herring Decl. ¶ 10).  BSRR contends that, in response to Mr. Herring's asking him why he did not report his knee pain the previous day, Wright responded by saying that the pain had not been that bad, and that he thought it would get better with rest like it had in the past. (Herring Decl. ¶ 9).  BSRR states that, based on Wright's denial of any injury and statement that his knee gave him problems from time to time, Mr. Herring suggested that Wright consult his personal physician about his knee pain, and asked Wright to keep him informed of his condition. (Herring Decl. ¶ 11).

[6]BSRR disputes this fact and contends that Wright did not report to work for ten days after going to see Dr. Thomas on May 6, 2005. According to BSRR, Wright called his supervisor on May 18, 2005 to report that the MRI had indicated a torn ligament, that he had decided to have surgery, and that he might be out of work for a while. (Herring Decl. ¶ 14).

(Thomas Dep. 9-10).  Wright told Dr. Thomas that Wright thought he had hurt his knee "on the pipe wrench" (Wright Dep. 81).[7]  Wright did not know the extent of his injury until Dr. Thomas told him his diagnosis. (Wright Dep. 194-95).  Dr. Thomas took x-rays on May 6, 2005, and told the Wright he had torn ligaments and he would order an MRI. (Wright Dep. 81).  The MRI revealed that Wright had popliteal cyst. (Thomas Dep. 11; 05/09/05 Eiland Record; 05/13/05 Montclair Clinic Record).  That kind of cyst is a small cyst behind the knee in the soft tissues behind the joint. (Thomas Dep. 11).  The MRI ordered by Dr. Thomas revealed a tear in the medial meniscus of the left knee. (Thomas Dep. 11; 05/09/05 Eiland Record).

Dr. Thomas explained that there are two common types of meniscal tears: acute and degenerative. (Thomas Dep. 26).  Dr. Thomas ruled out the possibility that Wright suffered an acute tear, based in part on Wright's statement that he did not have any history of trauma or injury to his knee. (Thomas Dep. 28).  Dr. Thomas characterized Wright's knee at the time of the operation as "chewed up" in such a manner that any activities Wright would have performed on May 5, 2005, such as working, walking, standing, sitting, etc. would not have caused the condition.

---

[7]BSRR disputes the fact that Wright informed Dr. Thomas of the alleged injury.  BSRR alleges that Wright stated that he did not suffer any injury to his knee on several occasions after his visit to Dr. Thomas on May 6, 2006, in particular when filling out an application for railroad disability benefits in July 2005. (Unum Provident Records).

(Thomas Dep. 35-36).  The doctor also found that the condition had been present in Wright's knee "for a good little while." (Thomas Dep. 35-36).  Dr. Thomas testified that many types of commonplace movements can cause a meniscal tear, and that "we'll never know" how, when, or why the tear occurred in Wright's knee. (Thomas Dep. 37-40, 52-53).[8]  On May 26, 2005, Dr. Thomas performed a successful orthoscopic surgery on Wright's left knee. (Thomas Dep. 14).

## E. Wright's Dismissal

On July 28, 2005, Wright was dismissed from his position with BSRR after an investigative hearing. (07/28/05 Termination Notice).  The hearing officer determined that Wright had violated several rules, including not reporting his alleged injury in a timely manner, and that he should be discharged. (Wright Dep. 144-145).  This termination was subsequently upheld by the Public Law Board which found that Wright did not comply with officer's directives and failed to report an alleged injury. (Public Law Board Opinion No. 6948).

Wright has tried to get his job with BSRR back and he has gone to "Railroad

---

[8]It is disputed between the parties whether Dr. Thomas found that Wright's knee problem was degenerative in nature. (Thomas Dep. 9-11, 23). It is further disputed that Dr. Thomas answered a hypothetical on the causation of the plaintiff's injury in the affirmative when asked if Wright's injury could have been caused by his position on the ground under the car while pushing a pipe wrench with his foot. (Thomas Dep. 11-14).  However, a careful review of such testimony establishes that Dr. Thomas testified that the circumstances described in the hypothetical "could certainly have been a definite aggravation" of Wright's condition.

Requirement" seeking work, but has been told that they won't give him job locations while he was trying to get hired at BSRR. (Wright Dep. 127). As previously discussed in this Opinion, Dr. Thomas's testimony does not establish that Wright was <u>able</u> to return to work on August 1, 2005. Rather, a reasonable inference is that Dr. Thomas <u>cleared</u> Wright to <u>try</u> to return to work, that is, to allow him to work <u>if he could do the job</u>. (Thomas dep. 19-20) Additionally, Wright testified that he can't work. (Wright dep. 128).

Wright states that anytime he tries to do work, the left side of his leg "goes into pain and gives out on me." (Wright Dep. 152-153). Dr. Thomas injected cortisone into Wright's left knee on the nine week anniversary of his surgery and Wright complained that if he stands too long his knee begins to hurt and gives way. (Wright Dep. 154). Wright reported this information to Defendant BSRR, but was informed that his employment had been terminated.[9]

## IV. APPLICABLE SUBSTANTIVE LAW AND ANALYSIS

## A. FELA

FELA provides that:

---

[9] The facts in this paragraph and the preceding paragraph are disputed by Defendant BSRR. BSRR claims that Wright could have returned to work as of August 1, 2005, and that he never applied for any job since his alleged injury.

> Every common carrier by railroad while engaging in commerce between any of the several States ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51.  In order for a claim under the FELA to survive summary judgment, a plaintiff must establish that: (1) the defendant is a common carrier railroad engaged in interstate commerce; (2) that the plaintiff was employed by the defendant with duties furthering such commerce; (3) that the plaintiff sustained an injury while he was so employed; and (4) that the injury was the result of the negligence of the defendant. *Fowler v. Seaboard Coastline R.R.*, 638 F.2d 17, 19 (5th Cir. 1981); *Moore v. Chesapeake & Ohio Ry.*, 340 U.S. 573, 575 (1951).  It is clear from the record that BSRR is a common carrier railroad engaged in interstate commerce and that Wright was employed by BSRR with duties furthering such commerce. Therefore, the issues left before the court on summary judgment is whether Wright has established admissible evidence that: (1) Wright sustained an on-the job injury while he was employed by BSRR; and (2) that injury was the result of the negligence of BSRR.

14

### 1.      Wright's Injury

There is a genuine issue of material fact as to whether Wright sustained an on-the-job injury during the course of his employment with BSRR.  Wright has offered evidence that his knee problems resulted from an injury sustained while he was working underneath a railcar.  Wright was pushing a pipe wrench with his foot in order to tighten the railcar doors.  Wright states that he hyper-extended his left knee while pushing on the pipe wrench with his foot. (Wright Dep. 65, 134, 184).  Wright presents evidence that he "hurt his knee with the pipe wrenches we was messing with under that car" and informed his supervisor of the injury on May 6, 2005. (Wright Dep. 71-72).

BSRR asserts that Wright did not sustain an injury while he was working on the railcar doors.  Herring, Wright's supervisor, stated that he asked Wright numerous times whether Wright had sustained an injury to his knee at work. (Herring Decl. ¶ 8).  According to Herring, Wright responded that he had not sustained an injury, but felt a slight "give" in his knee as he had walked to the bathhouse the previous day and that his knee was sore. (Herring Decl. ¶ 8).  Wright also told Herring that he had experienced similar pain in his knee in the past and that he did not want to file an injury report. (Herring Decl. ¶9-10).

BSRR argues that Wright did not sustain an injury on the job since he failed to file a report with the railroad in a timely manner.  Wright did eventually file an injury report with BSRR on June 8, 2005.  There is no case law cited by the parties or found by this court  holding that a failure to file an accident report in a timely manner indicates, *per se*, that the Plaintiff's injury did not happen on-the-job.

BSRR disputes whether Wright informed Dr. Thomas of the alleged injury. BSRR maintains that Wright told Dr. Thomas that he was having knee problems, but that he was unaware of any trauma or injury to his knee. (Thomas Dep. 9-10, 23, 55-56).  BSRR also offers evidence that Wright did not claim any injury when filling out his application for railroad disability benefits in July 2005 that there was "no known injury" as proof that Wright was not injured during his employment with BSRR. (Unum Provident Records).  However, Wright asserts that he told his physician, Dr. Thomas, that he was having knee problems and that he thought he had hurt his knee on the pipe wrench. (Wright Dep. 80-81).  In addition, Dr. Thomas could not give a definite answer as to the cause of Wright's knee problems. (Thomas Dep. 40).

Though BSRR offers evidence that Wright was not injured while in its employ, the evidence to the contrary presented by Wright creates a genuine dispute such that a reasonable jury could return a verdict for Wright.  Since the evidence on file shows a genuine issue of material fact as to whether Wright sustained an on-the-job injury

while employed by BSRR, the defendant's motion for summary judgment is **DENIED** as to whether Wright was injured on-the-job while employed at BSRR.

### 2.   Negligence of BSRR.

The court finds that there is a genuine issue of material fact as to whether Wright's injury was the result of the negligence of BSRR.   BSRR has a duty to provide its employees a reasonably safe working environment. *See Baltimore & Ohio Southwestern R.R, Co. v. Carroll*, 280 U.S. 491 (1930).   Wright argues that BSRR should be held to a higher standard of duty than that of the common law; however, there is a genuine issue of material fact regardless of what standard is used.   Wright has submitted evidence that his work environment at BSRR was not reasonably safe. Wright submits evidence that he was working in a cramped space which required him to use a hand tool with his foot in order to tighten the railcar doors. (Wright Dep. 57-59, 168).   Wright also claims that working on the railcar doors was a "rush job." (Wright Dep. 151).   Wright argues that this is evidence that BSRR was negligent in failing to provide Wright a reasonably safe place to work.

BSRR responds with evidence that Wright never told superiors that he believed his work conditions to be unsafe.   BSRR also presents evidence that no other employees have filed complaints for unsafe working conditions. (Herring Decl. ¶ 27).

Although BSRR has submitted evidence that would make it possible for a reasonable jury to find in BSRR's favor on this element, Wright has also submitted evidence that would make it possible for a reasonable jury to find in his favor.

Furthermore, there is also a genuine issue of material fact as to whether BSRR's possible negligence was the proximate cause of the meniscal tear in Wright's left knee.  In order for a plaintiff to recover, the evidence must show that the employer's negligence was the proximate cause, in whole or in part, of the injury. *Louisville & N. R.R. v. Green*, 53 So. 2d 358, 361 (Ala. 1951).  Although BSRR offers evidence that Wright's condition was the result of a pre-existing, degenerative condition (Thomas Dep. 9-11, 23, 26, 29), Wright offers evidence that the condition was caused by an injury sustained while lying on his back and using his foot to push the pipe wrench adjusting railcar doors. (Wright Dep. 189).

Based on the evidence submitted by both parties, a reasonable jury could find that Wright's injury was (or was not) caused by the negligence of BSRR.  Therefore, there is a genuine issue of material fact and BSRR's motion for summary judgment is **DENIED** as to whether Wright's injury was a result of BSRR's negligence.

### 3.    Mitigation of Damages

BSRR asserts that it is entitled to summary judgment on Wright's claim for lost

18

wages because "[h]e has failed to mitigate his alleged damages."  BSRR correctly asserts that the duty to mitigate damages applies in FELA cases just as it does in other cases.  However, BSRR ignores evidence which contradicts its statement of facts on which it relies to show that Wright has failed to mitigate his damages.  First, BSRR states that "plaintiff readily admits that he has not tried to get a job since his termination from BSRR."  However, a review of Wright's testimony shows that he has tried to get his job with BSRR back and that he has gone to "Railroad Requirement" seeking work, but has been told that they won't give him job locations while he was trying to get hired at BSRR.  (Wright dep. 127).  As previously discussed in this Opinion, Dr. Thomas's testimony does not establish that Wright was able to return to work on August 1, 2005.  Rather, a reasonable inference is that Dr. Thomas cleared Wright to try to return to work, that is, to allow him to work if he could do the job.  (Thomas dep. 19-20).  Additionally, Wright testified that he can't work.  (Wright dep. 128).

Mitigation of damages is an affirmative defense.  *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277 (11th Cir. 2000).  Thus BSRR, the moving party, has the burden of proof on the issue at trial and can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact.  *See Fitzpatrick*, 2 F.3d at 1115.  BSRR has failed in

meeting its initial burden, and thus summary judgment is due to be denied as to the issue of Wright's alleged damages.

### 4.      Wright's Termination

BSRR further argues that because its termination of Wright was proper, Wright cannot recover any lost wages after the date of such termination.  However, although BSRR acknowledges that Wright disputes that the facts which BSRR claims shows that BSRR had a legitimate reasons to fire Wright (see Defendant's Brief, doc. 11, fn13), BSRR improperly asks the court to resolve the factual dispute between it and Wright as to this point in their favor.  At summary judgment, all facts are to be viewed in the light most favorable to the non-movant.  *See Fitzpatrick*, 2 F.3d at 1115.  Thus, summary judgment in favor of BSRR is due to be denied as to Wright's claims for lost wages after the date of his termination.  The court is not saying that Wright can assert, under the FELA, a claim for wrongful termination (that is, that BSRR is liable to Wright for his termination even if he fails to establish injury and proximate causation), but that, rather, if Wright establishes the elements of his prima facie case, BSRR cannot cut off its liability by means of a pretextual termination (if the jury rejects BSRR's stated reason for termination).

Case 2:05-cv-01801-VEH   Document 17   Filed 02/23/07   Page 21 of 21

## V. ORDER

For the reasons set forth above, BSRR's motion for summary judgment as to

Wright's FELA claim is **DENIED**.

**DONE** and **ORDERED** this 23rd day of February, 2007.

_____
**VIRGINIA EMERSON HOPKINS**
**United States District Judge**